JS 44   (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Katherine Payne and Arthur Coates
(On their behalf and on behalf of a Class of Similar Persons)

**(b)** County of Residence of First Listed Plaintiff   Philadelphia, PA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Robert P. Cocco, Esquire
Pa. Id. No. 61907
1500 Walnut Street, Suite 900, Philadelphia, PA  19102  215-351-0200

## DEFENDANTS
Marriott Employees Federal Credit Union

County of Residence of First Listed Defendant   Montgomery County, MD
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government
  Plaintiff
- ☒ 3  Federal Question
  *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government
  Defendant
- ☐ 4  Diversity
  *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☒ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | Leave Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original
  Proceeding
- ☐ 2  Removed from
  State Court
- ☐ 3  Remanded from
  Appellate Court
- ☐ 4  Reinstated or
  Reopened
- ☐ 5  Transferred from
  Another District
  *(specify)*
- ☐ 6  Multidistrict
  Litigation -
  Transfer
- ☐ 8  Multidistrict
  Litigation -
  Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §1601 et seq.
Brief description of cause:
Truth in Lending Act disclosure case

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

DEMAND $
1,500,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE

DOCKET NUMBER

DATE
09/17/2018

SIGNATURE OF ATTORNEY OF RECORD
/s/ Robert P. Cocco

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT                    APPLYING IFP                    JUDGE                    MAG. JUDGE

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

### DESIGNATION FORM
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 6543 N. 17th Street, Philadelphia, PA 19126 _____

Address of Defendant: _____ 10400 Fernwood Road, Suite LL117, Bethesda, MD 20817 _____

Place of Accident, Incident or Transaction: _____ 6543 N. 17th Street, Philadelphia, PA 19126 _____

---

***RELATED CASE, IF ANY:***

Case Number: _____ n/a _____    Judge: _____    Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes ☐   No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes ☐   No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?   Yes ☐   No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?   Yes ☐   No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 09/18/2018 _____    _____    61907

*Attorney-at-Law / Pro Se Plaintiff*    *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.   *Federal Question Cases:***

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☐ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☑ 11. All other Federal Question Cases
  *(Please specify):* _____ TILA _____

**B.   *Diversity Jurisdiction Cases:***

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
  *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ ROBERT COCCO _____, counsel of record *or* pro se plaintiff, do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☑ Relief other than monetary damages is sought.

DATE: 09/18/2018 _____    _____    61907

*Attorney-at-Law / Pro Se Plaintiff*    *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| KATHERINE N. PAYNE and ARTHUR COATES, *individually and on behalf of all others similarly situated similarly situated* | : | CIVIL ACTION |
| v. | : | |
| | : | |
| MARRIOTT EMPLOYEES FEDERAL CREDIT UNION | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a)    Habeas Corpus -- Cases brought under 28 U.S.C. §2241 through §2255.                                                                 (     )

(b)    Social Security -- Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.                                                  (     )

(c)    Arbitration -- Cases required to be designated for arbitration under Local Civil Rule 8.                                           (     )

(d)    Asbestos -- Cases involving claims for personal injury or property damage from exposure to asbestos.                       (     )

(e)    Special Management -- Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)             ( X  )

(f)    Standard Management -- Cases that do not fall into any one of the other tracks.                                                    (     )

9/18/18
(Date)

_____
Attorney-at-law

ROBERT P. COCCO, ESQ.
Attorney for Plaintiff

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KATHERINE N. PAYNE and ARTHUR COATES, *individually and on behalf of all others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> MARRIOTT EMPLOYEES FEDERAL CREDIT UNION <br><br> Defendant. | CIVIL ACTION <br><br> NO. <br><br><br> **JURY TRIAL DEMANDED** |

### COMPLAINT – CLASS ACTION

## I.    INTRODUCTION

1.    Plaintiffs Katherine N. Payne ("Payne") and Arthur Coates ("Coates")(collectively "Plaintiffs") bring this class action against Defendant Marriott Employees Federal Credit Union ("MEFCU" or "Defendant") to obtain relief for themselves and the classes they propose to represent for MEFCU's unlawful lending practices in violation of the Truth in Lending Act, 15 U.S.C. §1601 *et seq.* ("TILA").

2.    TILA is Congress's effort to guarantee the accurate and meaningful disclosure of the costs of consumer credit and thereby to enable consumers to make informed choices in the credit marketplace and avoid abusive lending. *See, e.g., Cappuccio v. Prime Capital Funding L.L.C.*, 649 F.3d 180 (3d Cir. 2011) ("Congress enacted TILA to guard against the danger of unscrupulous lenders taking advantage of consumers through fraudulent or otherwise confusing practices."); *Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114 (9th Cir. 2009) ("Congress enacted TILA 'to assure a meaningful disclosure of credit terms so that the consumer will be able

to compare more readily the various credit terms available ... and avoid the uninformed use of credit....'") (citing 15 U.S.C. § 1601); *Williams v. Chartwell Fin. Servs., Ltd.*, 204 F.3d 748 (7th Cir. 2000) ("Congress enacted TILA to ensure that consumers receive accurate information from creditors in a precise and uniform manner that allows them to compare the cost of credit."); *Rodash v. AIB Mortgage Co.*, 16 F.3d 1142 (11th Cir. 1994) (TILA intended to promote informed use and awareness of cost of credit; ensure meaningful disclosure to enable ready comparison of credit terms); *First Nat'l Bank v. Office of the Comptroller*, 956 F.2d 1456 (8th Cir. 1992) (fundamental purpose of the Act is to require disclosure of true cost of credit so consumers can make informed choice).

3.     TILA was passed with the specific congressional finding:

> The Congress finds that economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit. The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.

15 U.S.C.A. § 1601.

4.     At issue in this litigation is MEFCU's pattern and practices related to its mini-loan product extended to the Plaintiffs and the putative class members within one year of the filing of this action which did not clearly disclose the true costs of the product to the Plaintiffs and class members as Congress required in TILA.

5.     As a direct and proximate consequence of MEFCU's inaccurate disclosures violating TILA, Plaintiffs and the putative class members have sustained real harm and damages from MFCFU's mimi-loan product including:

a. Uninformed use of credit, with respect to credit transactions.

b. Disguised the true costs of the product to consumers.

c. Because MEFCU's mini-loan product is offered only to employees of the MEFCU's sponsor companies including Marriott International, Inc. ("Marriott") and is tied to the wages from Marriott, Plaintiffs and the putative class members are dissuaded from exercising their fundamental rights to seek employment opportunities greater than what is extended by Marriott during the term of the loan because (i) wages controlled and paid by Marriott depend on the number of hours it offers to offer them on a weekly basis and (ii) the fees and conditions exacted upon them by MEFCU related to the product.

## II.    JURISDICTION AND VENUE

6.    This Court has jurisdiction pursuant to 15 U.S.C. §§1640 (TILA) 28 U.S.C.A. § 1331 since certain of the claims asserted herein arise under the laws of the United States.

7.    Venue is appropriate in this Court pursuant to 28 U.S.C.A. § 1391 because a substantial portion of the events or omissions giving rise to the claims before the Court occurred in this District.

## III.    PARTIES

8.    Katherine Payne ("Payne" or "Plaintiff") is a natural person, who resides at 6543 N. 17th Street, Philadelphia, PA  19126.  Payne is a "consumer" as that term is defined in 15 U.S.C.A. § 1602(i). The loans she obtained were primarily for personal, family or household purposes.

9.    Arthur Coates ("Coates" or "Plaintiff") is a natural person, who resides at 4923 N. 8th Street, Philadelphia, PA.  Coates is a "consumer" as that term is defined in 15 U.S.C.A. §

1602(i). The loans he obtained were primarily for personal, family or household purposes.

10.     Defendant Marriott Employees Federal Credit Union ("MEFCU" or "Defendant") is a federal credit union that is regulated by the National Credit Union Administration ("NCUA").

11.     Enacted during the depths of the Great Depression, the Federal Credit Union Act enabled credit unions, like MEFCU, to be organized throughout the United States under charters approved by the federal government. Congress intended to make credit available to more Americans and promote thrift through a national system of nonprofit, cooperative credit unions.

12.     MEFCU is a "creditor" as that term is defined in 15 U.S.C.A. § 1602(g).

13.     MEFCU's Chief Executive Officer is James G. Newton.  MEFCU's corporate offices are located at 10400 Fernwood Road, Suite LL117, Bethesda, MD  20817-1102 but as discussed *infra* it markets its products and services indirectly through Marriott and its other partners in this District.

14.     Not named as a party to this action is Marriott which sponsors MEFCU and effectively controls MEFCU's operations through Marriott executives who serve as the controlling members of the MEFCU's board of directors.   As discussed *infra*, Marriott's corporate employees also assist in arranging the extension of the mini-loan product to the putative class members which is marketed to the putative class members through Marriott's local human resource departments located in the District.

15.     Not named as a party to this action, the Philadelphia Marriott Downtown has a business relationship with Marriott in which Marriott manages the location and markets MEFCU's products to the hotel employees who are also employed by Marriott.

## IV.    FACTS

A.     **Background About MEFCU & the Mini-Loan Product**

16.     According to public data available from NCUA on September 15, 2018, MEFCU has assets valued at the approximate sum of $192,258,979 and it has approximately 32,584 members nationwide. In this District MEFCU has more than 500 members.

17.     MEFCU offers to its members a mini-loan product through Marriott's local human resources offices in this District.

18.     In order to be eligible for the mini-loan product, MEFCU members: (i) must be a in good standing; (ii) must agree to a direct deposit of a minimum of $33 weekly from their wages to their MEFCU account before the extension of the mini-loan; (iii) must not be in bankruptcy and (iv) have no other mini-loan from MEFCU that has not been satisfied.

19.     As a further condition of the mini-loan product, MEFCU requires the borrower to also authorize MEFCU to obtain payroll deductions from the MEFCU members' Marriott wages including the sum of $10 per week _plus_ the loan payment amount. However, the $10 per week amount is frozen by MEFCU so the mini-loan borrower may not use that amount effectively acts as cash security for the loan. In addition, requires mini-loan borrowers to pledge and grant MEFCU a security interest in their share account(s) with MEFCU as further collateral for receiving the loan.

20.     The mini-loan is advertised outside of the Philadelphia Marriott Downtown's human resources department and by the human resource employees, and the MEFCU provides the loan to all employees who join the MEFCU without (1) running any credit check or obtaining a credit reports, (2) performing any credit investigation, and (3) obtaining any appraisals.

21.    MEFCU simply communicates to Marriott that the agreed upon sums shall be deducted from the consumer's payroll deductions.    Upon information belief all such communications are done electronically and the actual costs incurred are *de minimis*.

22.    Despite the fact that MEFCU incurs no material costs for receipt of an a mini-loan application and performs no legitimate investigation into a consumer's credit history and creditworthiness which a customary creditor would conduct, MEFCU charges to all MEFCU employee borrowers $35 for what it labels an "application fee" for each mini-loan application:

  a.    Even when the borrowers have previously applied for a mini-loan with MEFCU or paid off multiple prior mini-loans to MEFCU; and

  b.    Even though the fee is only collected from those consumer applicants from who MEFCU actually extends the loan since the fee is deducted as a matter of pattern and practice from the loan proceeds itself.

23.    According to public records available from the December 2017 Call Reports that are filed with the NCUA, MEFCU's effective income from fees as a percentage of sums loaned to borrowers is excessively high when compared to other credit unions:

| FEES CHARGED FOR EVERY $100 LOANED | |
|---|---:|
| Marriott Employees FCU | $11 |
| Philadelphia FCU | $4 |
| Philadelphia Police and Fire FCU | $2 |
| American Heritage FCU | $2 |
| Penn State FCU | $2 |
| Campbell Employees FCU | $2 |
| Navy Federal FCU | $1 |

24.    MEFCU markets its mini-loan product to lower income Marriott employees who perform the day-to-day, hourly work of running Marriott's hotels and who live paycheck to paycheck. Recent studies have concluded that irregular scheduling by employers is a nationwide problem that creates extreme economic uncertainty for tens of millions of American workers and has a disproportionate impact on women and people of color.  Center for Popular Democracy, *Women      in      Today's      Workforce*,      May      2015,      *available      at* http://populardemocracy.org/sites/default/files/HourbyHour_final.pdf.

25.    Since the hours offered by Marriott to these hourly employees is controlled by Marriott, when those hours are reduced, the employees look to products like MEFCU's mini-loan to help cover basic essential for their personal, family and household needs.  However, the true costs and terms of the mini-loan are not disclosed accurately nor are they clearly and conspicuously disclosed to the mini-loan borrower in a manner required under TILA. The borrower is not provided the true costs and terms of the loan.

26.    Thus, while the mini-loan may appear to be a free-standing financial product, it is part-and-parcel of the unequal bargaining relationship between the Marriott and its employees. By providing employees with quick cash when needed and indebting them to their employer, the mini-loan allows the Marriott to retain its workforce even while subjecting workers to unfair and unpredictable scheduling practices.

27.    The mini-loan gives employees quick access to $500.00 that they can use to pay off living expenses that are unaffordable when hours are reduced. In exchange, employees agree to make automatic payments out of their MEFCU account of (1) a $35.00 "application fee", (2) the sum of $90.00 per month for five months, and (3) a final payment of $79.23, for a total of $564.23. This amount does not include a $250.00 required cash security deposit that accumulates

through $10.00 weekly deductions from the mini-loan borrowers' wages that is held in a MEFCU share savings account but frozen and inaccessible to borrower, during the loan payment period.

28.     Most Marriott employees of the Downtown Marriott Philadelphia who have utilized the MEFCU mini-loan say that they have constantly and repeatedly taken out mini-loans throughout their entire employment to be able to afford living expenses and the "application fee" has only been charged to them when their mini-loans were approved.  Further, these employees also report their credit has never been pulled by MEFCU and no one from MEFCU has ever contacted them to investigate any parts of their application.

29.     As a non-profit credit union, MEFCU is supposed to serve all members on equal terms.  The mini-loans, however, create effectively no risk for the MEFCU but create real burdens for those members who need the product as compared to other loan products for higher income borrowers. By extracting payments out of wages, taking cash security, and effectively tying mini-loan borrowers to continued employment to Marriott to pay the loan, MEFCU is able to effectively eliminate the possibility of default and thereby render the mini-loan product highly profitable.

30.     It should also be noted that MEFCU is not permitted to charge interest of more than 18% APR on any loan.  Nat'l Credit Union Admin., Board Action Bulletin, Board Meeting Results for Feb. 23, 2017, available at https://www.ncua.gov/newsroom/Pages/news-2017-board-extends-18-percent-interest-rate-cap.aspx.

31.     It has been reported that some credit unions evade the cap by charging excessive "application fees." Nat'l Consumer L. Ctr., *Stopping the Payday Loan Trap*, June 2010, at p. 28, *available    at*    https://www.nclc.org/images/pdf/high_cost_small_loans/payday_loans/report-

stopping-payday-trap.pdf ("Kinecta Federal Credit Union offers payday loans, marketed through its Nix Check Cashing subsidiary. Despite the fact that federal law subjects Kinecta, as a federal credit union, to an 18% annual interest usury cap, the credit union evades that limit by charging a $39.95 application fee for each of its standard $400 14-day loans on top of 15% annual interest.").

32.    Based on a review of multiple mini-loan transactions,  MEFCU appears to be evading the interest rate cap by charging the fictitious $35.00 "application fee" with its mini-loan product. While MEFCU's mini-loan credit agreement does disclose an 18% APR, based on a finance charge of $29.23 for the six-month loan, the Plaintiffs and putative class members must also pay the additional $35.00 application fee that is not included in that finance charge and provide cash security. Including the "application fee" as part of the finance charge would give rise to an APR of about 46% on each transaction.

33.    Finally, it should be noted that the MEFCU mini-loan is not a payday alternative loan ("PAL") that has been authorized by NCUA since 2010 but is similar in nature.  Of import to the facts and issues before the Court is that NCUA capped the application fee limit for PAL loans to the maximum application fee of $20 because the NCUA Board "believe[d] a maximum application fee of $20 is sufficient to allow FCUs to recoup the costs associated with processing an application for a [PAL] loan."  Short-Term, Small Amount Loans, 75 FR 58285-01 at *58287. This agency conclusion leads to the presumption that the $35 so-called application fee assessed by MEFCU is not reasonable and far exceeds MEFCU's true costs (if it even has any legitimate application costs) related to the mini-loan since the PAL loans are far riskier and have no secured interest in the borrower's accounts as a condition of the PAL loan.

**B.**   **About the TILA Class Claims Before the Court**

34.   The Third Circuit has explained:

> Through TILA, Congress sought to remedy the "divergent and often fraudulent practices by which credit customers were apprised of the terms of the credit extended to them." *Johnson v. McCrackin–Sturman Ford, Inc.,* 527 F.2d 257, 262 (3d Cir.1975). Indeed, the congressionally stated purpose of TILA is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him." 15 U.S.C. § 1601(a). TILA, as a remedial statute which is designed to balance the scales "thought to be weighed in favor of lenders," is to be liberally construed in favor of borrowers. *Bizier v. Globe Financial Services,* 654 F.2d 1, 3 (1st Cir.1981). *See Johnson,* 527 F.2d at 262.

> TILA achieves its remedial goals by a system of strict liability in favor of the consumers when mandated disclosures have not been made. 15 U.S.C. § 1640(a). A creditor who fails to comply with TILA in any respect is liable to the consumer under the statute regardless of the nature of the violation or the creditor's intent. *Thomka v. A.Z. Chevrolet Inc.,* 619 F.2d 246, 249–50 (3d Cir.1980). "[O]nce the court finds a violation, no matter how technical, it has no discretion with respect to liability." *Grant v. Imperial Motors,* 539 F.2d 506, 510 (5th Cir.1976).

> A single violation of TILA gives rise to full liability for statutory damages.

*Smith v. Fid. Consumer Disc. Co.*, 898 F.2d 896, 898 (3d Cir. 1990)

35.   Congress has also specifically authorized class actions pursuant to TILA.   15 U.S.C. § 1640(a).   *See also* 15 U.S.C. § 1640(a)(2)(b), as amended by Pub. L. No. 111-203, § 1416(a)(2), 124 Stat. 1376 (July 21, 2010)(increasing "the total recovery [for statutory damages under TILA] in any class action or series of class actions arising out of the same failure to comply by the same creditor shall be not more than the lesser of $1,000,000 or 1 per centum of the net worth of the creditor").   In fact many TILA violations are unusually well-suited to class action treatment. Violations like those before the Court in this action are often apparent on the face of the written documents and the creditor's standard practice and procedures, which is true

here because the application fee is set forth on the mini-loan documents and MEFCU treats the mini-loans the same way.

36.    A creditor's disclosed interest rate can be a misleading price tag for credit to a consumer because (1) an interest rate can be calculated in a variety of ways, each extracting a different dollar amount from the consumer; (2) a creditor might not include all charges incident to a credit transaction are reflected in that interest rate.

37.    To make sure consumers were given clear, unambiguous disclosure of the true cost of their credit, Congress' approach under TILA was to design a price tag that reflected a standardized definition of the cost of credit for both interest rate and fees.

38.    Further, to help create this standardized definition, Congress has given certain agencies over the course of time the authority to establish certain requirements in Regulation Z to TILA to carry out its requirements.  Relevant to this action and to the misleading disclosure issue before the Court are the following requirements:

a.    A creditor may not fail to include in the finance charge certain charges imposed by it that is payable by the consumer incident to the extension of credit as required by 15 U.S.C. § 1605 and Regulation Z § 1026.4.  If the creditor does fail to include such a charge it improperly discloses the finance charge in violation of 15 U.S.C. § 1638(a)(3) and Regulation Z § 1026.18(d).

b.    By calculating the annual percentage rate (APR) based upon improperly calculated and disclosed finance charges and amount financed, 15 U.S.C. § 1606, Regulation Z § 1026.22, a creditor would also unlawfully understate the disclosed annual percentage rate in violation of 15 U.S.C. § 1638(a)(4) and Regulation Z § 1026.18(e).

39.    Regulation Z defines the term "finance charge" as "the cost of consumer credit." 12 CFR § 226.4 (2004).

40.    To be accurate, the disclosed finance charge must reflect: (i) The inclusion of all types of charges that TILA defines as part of the finance charge for that particular transaction, i.e., proper allocation of charges between the amount financed and the finance charge; and (ii) Proper computation of each component charge of the total finance charge, and proper disclosure of the resulting total charge.

41.    In general, creditors are not required to include any "application fees" as part of the finance charge. Under Regulation Z, the "finance charge" excludes "[a]pplication fees charged to all applicants for credit, whether or not credit is actually extended." 12 C.F.R. § 226.4. However, to qualify as a qualified "application fee," and thus be excluded from the finance charge used to calculate the APR, the charge must be a genuine application fee designed to allow creditors to recoup the reasonable costs of processing applications. The Official Interpretation from the FRB explains:

> An application fee that is excluded from the finance charge is a charge to recover the costs associated with processing applications for credit. The fee may cover the costs of services such as credit reports, credit investigations, and appraisals. The creditor is free to impose the fee in only certain of its loan programs, such as mortgage loans. However, if the fee is to be excluded from the finance charge under § 1026.4(c)(1), it must be charged to all applicants, not just to applicants who are approved or who actually receive credit.

12 C.F.R. Part 226, Supplement I (Official Staff Interpretations), § 226.4, ¶ 4(c)(1), Comment 1.[1]

42.    If the creditor does not incur application costs or charges sums in excess of the actual reasonable costs, the purported application fee is not properly excluded from the finance charge.

---

[1]    *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 564 (1980) (Federal Reserve Board Staff Opinions construing the Act should be dispositive unless "demonstrably irrational").

### C.    Named Plaintiffs' Allegations

43.    Payne has worked as an hourly housekeeper at the Philadelphia Marriott Downtown for approximately eight (8) years and has been a member of the MEFCU for about the same amount of time.  MEFCU membership was promoted to her as an employee benefit when she was hired by the hotel.

44.    Payne's assigned hours are controlled by Marriott and fluctuate so that she cannot forecast her earnings on a regular basis.

45.    In the last eight years, including last September 19, 2017, Payne has utilized MEFCU's mini-loan product to help her pay for her personal, family household expenses—especially when her income has dropped as a result of reduced working hours offered by Marriott.

46.    On or about September 15, 2017 Payne last applied for a mini-loan from MEFCU and it took the "application fee" from her account at MEFCU.  As had been her experience in the past, MEFCU did not perform any credit check or investigation of her application, did not make any inquiries of her related to the application, and did not conduct any appraisal of her property related to the mini-loan application.  It simply required her to grant it a secured interest in her share accounts and wages as discussed *supra*.

47.    On September 19, 2017, without having actually performed any bona fide investigation of her application, MEFCU advanced the mini-loan sum to Payne and she was thereafter obligated as discussed *supra* to repay the loan.  Her first payment was then due on or before October 28, 2017.

48.    Commencing on or about October 2, 2017, MEFCU began withdrawing $10 from Payne's wages on a weekly basis as cash security for Payne's September 19, 2017 MEFCU mini-loan.

49.    Payne's September 19, 2017 MEFCU's mini-loan credit agreement disclosed an 18% APR, based on a finance charge of $29.23 for the six-month loan.  However, Payne was also required to pay $35.00 for an "application fee" that was not related to any bona fide application service and did not represent any reasonable sum of application expenses MEFCU actually incurred as a result of the transaction. MEFCU excluded the $35 charge from the finance charge.

50.    As a result of MEFCU's exclusion of the $35 charge from the finance charge, the APR disclosure to Payne was understated. The true APR for her September 19, 2017 mini-loan was actually 46% and not the 18% disclosed by MEFCU. MEFCU's violations of TILA include:

    a.  failing to properly disclose the finance charge when it chose to exclude the "application fee" that was incident to the extension of credit by MEFCU to Payne (as required by 15 U.S.C. § 1605, § 1638(a)(3) and Regulation Z § 1026.4);

    b.  failing to properly disclose the amount financed for the loan because it improperly included the "application fee" in the amount financed. (in violation of 15 U.S.C. § 1638(a)(2) and Regulation Z § 1026.18(b)) and;

    c.  failing to disclose the APR (in violation of 15 U.S.C. § 1638(a)(4) and Regulation Z § 1026.18(e)).

51.    In addition, by calculating the APR based upon improperly calculated and disclosed finance charges and amount financed (15 U.S.C. § 1606, Regulation Z § 1026.22), the

APR disclosed by MEFCU to Payne was understated (in violation of 15 U.S.C. § 1638(a)(4) and Regulation Z § 1026.18(e)).

52.     The TILA disclosure MEFCU also provided to Payne violated 12 C.F.R. § 1026.18(m) by failing to disclose to Payne that MEFCU would acquire a security interest in Payne's other property including her share accounts, sums in the share accounts, and portions of her future wages.

53.     Coates has worked as an hourly employee at the Philadelphia Marriott Downtown for approximately 15 years and has been a member of the MEFCU about the same amount of time.  MEFCU membership was promoted to him as an employee benefit when he was hired by the hotel.

54.     Coates' assigned hours are controlled by Marriott and fluctuate so that he cannot forecast his earnings on a regular basis.

55.     In the last 14 years, including last July 16, 2018, Coates has utilized MEFCU's mini-loan product to help him pay for her personal, family household expenses—especially when his income has dropped as a result of reduced working hours offered by Marriott.

56.     On or about July 9, 2018 Coates last applied for a mini-loan from MEFCU and it took the "application fee" from his account at MEFCU.  As had been his experience in the past, MEFCU did not perform any credit check or investigation of his application, did not make any inquiries of him related to the application, and did not conduct any appraisal of his property related to the mini-loan application.  It simply required him to grant it a secured interest in his share accounts and wages as discussed *supra*.

57.     On or before July 16, 2018, without having actually performed any bona fide investigation of his application, MEFCU advanced the mini-loan sum to Coates and he was

thereafter obligated as discussed *supra* to repay the loan. His first payment was then due on or before August 20, 2018.

58.     Commencing on or about July 11, 2018, MEFCU began withdrawing $10 from Coates' wages on a weekly basis as cash security for Coates' July 16, 2018 MEFCU mini-loan.

59.     Coates' July 11, 2018 MEFCU's mini-loan credit agreement disclosed an 18% APR, based on a finance charge of $29.23 for the six-month loan. However, Coates was also required to pay a $35.00 for an "application fee" that was not related to any bona fide application service and did not represent any reasonable sum of application expenses MEFCU actually incurred as a result of the transaction. MEFCU excluded the $35 charge from the finance charge.

60.     As a result of MEFCU's exclusion of the $35 charge from the finance charge, the APR disclosure to Coates was understated. The true APR for his July 16, 2018 mini-loan was actually 46% not the 18% disclosed by MEFCU. MEFCU's violations of TILA include:

    a.   failing to properly disclose the finance charge when it chose to exclude the "application fee" that was incident to the extension of credit by MEFCU to Payne (as required by 15 U.S.C. § 1605, § 1638(a)(3) and Regulation Z § 1026.4);

    b.   failing to properly disclose the amount financed for the loan because it improperly included the "application fee" in the amount financed. (in violation of 15 U.S.C. § 1638(a)(2) and Regulation Z § 1026.18(b)) and;

    c.   failing to disclose the APR (in violation of 15 U.S.C. § 1638(a)(4) and Regulation Z § 1026.18(e)).

61.     In addition, by calculating the APR based upon improperly calculated and disclosed finance charges and amount financed (15 U.S.C. § 1606, Regulation Z § 1026.22), the

APR disclosed by MEFCU to Coates was understated (in violation of 15 U.S.C. § 1638(a)(4) and Regulation Z § 1026.18(e)).

62.    The TILA disclosure MEFCU also provided to Coates violated 12 C.F.R. § 1026.18(m) by failing to disclose to Coates that MEFCU would acquire a security interest in Coates' other property including his share accounts, sums in the share accounts, and portions of his future wages.

## IV.    Class Action Allegations

63.    This action is brought as a class action pursuant to Fed. R. Civ.P. 23(a) and 23(b).

64.    The Class is defined as follows

All persons in the Commonwealth of Pennsylvania who (i) borrowed money from MEFCU in the one-year before the commencement of this action through its mini-loan product and (ii) were given a Federal Truth in Lending Disclosure Statement which incorrectly set forth the APR to be charged on the loan or did not disclose that MEFCU would acquire a security interest in the person's other property.

65.    The members of the Class are capable of being identified without difficult managerial or administrative problems. MEFCU maintains electronic records that track information about borrowers, their loans, and any correspondence sent to borrowers to enable it to identify particular categories of borrowers from its electronic systems.

66.    The Class members are sufficiently numerous that individual joinder of all members is impractical. Based upon the public data available about MEFCU and the sheer numbers of lower income, hourly employees in Pennsylvania who are employed by MEFCU, and based upon information ad belief, the Class exceeds more than 100 persons.

67.    There are questions of law and fact common to the Class which predominate over any questions affecting only individual members of the Class and, in fact, the wrongs alleged against MEFCU by the Class members and the remedies sought by Class members against

MEFCU are identical, the only potential difference being the exact sum borrowed through the MEFCU mini-loan product.

68.    The common issues related to the Class members include, but are certainly not limited to:

a.    Does MEFCU incur any expenses or costs related the application fee?

b.    Does MEFCU actually charge the mini-loan applicants who are denied the mini-loan the $35 application fee?

c.    Do MEFCU's actual, reasonable costs related to the receipt of a mini-loan application equal $35 or a materially smaller sum?

d.    Did MEFCU properly disclose that it was obtaining a security interest on the other property of the borrowers?

e.    Did MEFCU's conduct in loaning money through its mini-loan product violate TILA?

69.    Plaintiff's legal and equitable claims are typical and the same or identical for each of the member of the Class and will be based on the same legal and factual theories identified *supra*.

70.    MEFCU's defenses (which defenses are denied) would be typical and the same or identical for each of the member of the Class and will be based on the same legal and factual theories.

71.    The Plaintiffs will also fairly and adequately represent and protect the interests of the Class members.   Plaintiffs have retained counsel experienced in consumer class actions including actions involving unlawful collection and lending practices.  Plaintiffs do not have any

interests which might cause them not to vigorously prosecute this action or are otherwise adverse to the interests of the members of the Class.

72.    Certification of the Class under Fed. R. Civ.P. 23(a) and 23(b) for the injunctive and declaratory relief sought and for the damages claims in that common questions predominate over any individual questions and a class action is superior for the fair and efficient adjudication of this controversy.  A class action will cause an orderly and expeditious administration of claims by the Class members, and economies of time, effort and expenses will be fostered and uniformity of decisions will be insured.

73.    Plaintiffs' claims are typical of the claims of the Class members.

74.    Plaintiffs will fairly and adequately protect the interests of all Class members in the prosecution of this action. The Plaintiffs are similarly situated with, and have suffered similar injuries as, the members of the Class they seek to represent. The Plaintiffs (i) feel that they have been wronged, (ii) wish to obtain redress of the wrong, and (iii) want Defendant stopped from imposing and collecting unreasonable fees and providing incorrect disclosures and otherwise stopped from perpetrating similar wrongs on others.

75.    The Class members have suffered damages, losses, and harm similar those sustained by the Plaintiffs and described above.

## V.    CAUSES OF ACTION

### <u>COUNT I – TILA – CLASS CLAIM</u>

76.    Plaintiffs incorporate all prior paragraphs herein.

77.    Plaintiffs' and the Class member's MEFCU mini-loans were consumer credit transactions, and were subject to the disclosure requirements of the Truth in Lending Act, 15

U.S.C. § 1601, *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

78.     MEFCU is a "creditor" as defined by TILA because it was named as the lender in each of the Plaintiffs' and Class members' mini-loan documents and it retained all rights to the sums collected from them during the term of the transactions.

79.     MEFCU's mini-loan credit agreements with the Plaintiffs and the Class members disclosed an 18% APR, based on a finance charge of $29.23 for the six-month loan. However, the Plaintiffs and the Class members were also required to pay an additional $35.00 "application fee" that was not included in that finance charge but should have been because it was not related to any bona fide application service, and did not represent any reasonable sum of application expenses MEFCU actually incurred as a result of the transaction.

80.     As a result MEFCU's APR disclosure to Plaintiffs and the Class members understated the actual APR for their mini-loans. The true APR was about 46%; not the 18% APR disclosed.

81.     As a result, MEFCU violated TILA by: (i) failing to accurately disclose the finance charge (as required by 15 U.S.C. § 1605, § 1638(a)(3) and Regulation Z § 1026.4); (ii) failing to properly disclose the amount financed (in violation of 15 U.S.C. § 1638(a)(2) and Regulation Z § 1026.18(b)) and (iii) by failing to disclose the true APR (in violation of 15 U.S.C. § 1638(a)(4) and Regulation Z § 1026.18(e)).

82.     In addition MEFCU's disclosure statements to the Plaintiffs and the putative class members also violated 12 C.F.R. § 1026.18(m) by failing to disclose to Plaintiffs and the putative class members that MEFCU would acquire a security interest in their other property including their share accounts, sums in the share accounts, and portions of his future wages.

83.    Plaintiffs and the Class members have been injured and have suffered monetary losses arising from MEFCU's violations of the TILA. These losses include the assessment of an unreasonable application fee for which no reasonable costs were actually incurred by MEFCU or the reasonable costs fees actually incurred by MEFCU actually are materially less than the sums collected by MEFCU from the Plaintiffs and the Class members. In addition, the Plaintiffs and the Class members are damaged as a result of not receiving a true cost of the mini-loan product as required by TILA so that they could make an informed decision about the transaction. Finally, as a result Plaintiffs and the Class members are entitled to statutory damages pursuant to TILA.

## JURY DEMAND

Plaintiffs demand trial by jury on their claims and on behalf of the Class members.

## PRAYER FOR DAMAGES

Plaintiffs respectfully pray that judgment be entered against the Defendant for the following:

A. For Named Plaintiffs against the Defendant:

1. Certify this case as a class action with the Plaintiffs as class representative and their attorneys as class counsel on behalf of the Class members described herein;

2. Grant a money judgment in favor of the Plaintiffs and the Class members for violations of TILA, as described herein, in such damage amount as to be determined at trial and for purposes of a sum certain directly related to the improper assessment of unreasonable application fees in far excess of what was permitted and actually reasonably incurred, subject to further discovery as

- 21 -

to the size of the class, the amount sought on behalf of the class is in excess of $75,000.00;

3. Grant a further money judgment for statutory damages to the Plaintiffs and the Class members equal to $1,000,000.00 or 1% of Defendants' net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2);

4. Award reasonable attorney's fees, litigation expenses and costs pursuant to 15 U.S.C. § 1640(a)(3);

Dated: September 18, 2018

_____
Robert P. Cocco, P.C.
Attorney for Plaintiff
By:  Robert P. Cocco, Esquire
Pa. Id. No. 61907
1500 Walnut Street, Suite 900
Philadelphia, PA 19102
(215) 351-0200
rcocco@rcn.com

Attorney for Plaintiffs